**KELL-DOT INDUSTRIES, INC., et al.,**
Appellants,

v.

George O. GRAVES, d/b/a Michiana
Mills, Appellee.

No. 17800.

United States Court of Appeals
Eighth Circuit.

May 18, 1966.

Gordon D. Schmidt, of Hovey, Schmidt, Johnson & Hovey, Kansas City, Mo., made argument for appellants and filed brief.

Marmaduke A. Hobbs, South Bend, Ind., made argument for appellee and filed brief with Scofield, Kokjer, Scofield & Lowe, Kansas City, Mo.

Before VOGEL, Chief Judge, and RIDGE * and MEHAFFY, Circuit Judges.

* Judge Ridge, while a member of the panel before whom this case was argued, did not, by reason of a temporary disability, participate in the final determination of the case or the writing of the opinion.

MEHAFFY, Circuit Judge.

This appeal involves the validity of a patent issued upon a "food processing machine" and its alleged infringement.

George O. Graves, d/b/a Michiana Mills, inventor and owner of the patent in suit, brought this action for infringement against Kell-Dot Industries, Inc., Edwin F. Kelley, and Manley, Inc. Defendants denied liability and, by affirmative defense, pleaded invalidity of the patent. The District Court, in a published opinion, Graves v. Kell-Dot Industries, Inc., 229 F.Supp. 143 (W.D. Mo.1964), ruled the patent valid and infringed.

Based primarily on the recent teachings of the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), we conclude that the patent is invalid and, therefore, reverse.

### The Patent in Suit

The Graves patent in suit, No. 2,842,-072, was issued July 8, 1958 upon application filed March 21, 1956. The patented device is a food processing machine for producing and extruding from corn meal a puffed edible product known in the trade as "collets." Meal is prebaked to eliminate the moisture content and then extruded through a head plate where the cooler atmospheric temperature causes it to pop or puff. A knife attachment cuts the material to the desired length. The raw "collets" are then further baked, salted, flavored, and packaged and sold under various trade names such as "Corn Puffs," "Korn Kurls," and "Jacks." The District Court aptly described the machine:

"The machine consists essentially of a housing with a bore therein, a rotatable member within the bore with a helical ridge on the periphery, a single extrusion die plate with a plu-

rality of extrusion holes therein, each of the holes having a conical inlet connected to a cylindrical or elongate portion extending through the die plate, an annular flange on the periphery of the die plate with holes therein for securing the die plate to the housing, and a knife intermittently passing the outlet ends of the extrusion holes for cutting the extruded material in sections."

In 1948, plaintiff was furnished drawings of the Schwebke machine, which he identified as Patent No. 2,350,643, dated June 1944, and engaged by his brother and Darwin F. Rosebrook to design a "collet" machine.[1] His design contained multiple extrusion or head plates and was patented No. 2,705,927 on April 12, 1955. It is referred to hereafter as the "G & R patent."

In 1948 plaintiff associated in business with his brother and Rosebrook, owners of the G & R patent, but withdrew in 1952 following a dispute over royalties. Plaintiff took a G & R machine for his own use under what he now asserts to have been an oral agreement with his brother and Rosebrook.

Following the common disaster death of plaintiff's brother and Rosebrook in 1953 and difficulties with the widows who had inherited the G & R patent, plaintiff modified his machine from a two-stage dual head plate to a two-stage single head plate arrangement. Early in 1956 the machine was again changed to a single stage, single head plate device and patented by plaintiff. It is upon this patent that the case at bar issued.

Machines embodying plaintiff's patent have been in commercial operation since 1956. They are constructed, sold and leased by plaintiff who at trial date had eighteen out on lease agreements. There are five claims upon which the patent in suit was issued.[2]

---

1. Although plaintiff verified use of the Schwebke machine, he identified it as Patent No. 2,350,643 dated June 1944 which is, we think, a mistake. We note the discrepancy as a mere oversight.

2. "1. In a machine for extruding and puffing cereal meal: a housing having a bore therein, a rotatable member in said bore having a helical ridge on the periphery thereof, an extrusion die plate mounted

The District Court found "invention" in the utilization of a single stage, single head plate in a food processing machine because such usage embodied a new mode of operation. All components of plain-

on said housing across said bore and having a plurality of extrusion holes extending through the plate and communicating directly with the area in said bore occupied by the ridged periphery of said member, each of said holes having an inlet portion tapering inwardly and a cyclindrical portion connected to said tapered portion and extending through the plate to the outside surface thereof, the total cross sectional area of said cylindrical portions being sufficiently less than the cross sectional area of said bore occupied by said helical ridge and the length of said cylindrical portions being sufficiently great to create sufficient friction and pressure to raise the temperature of the meal being fed therethrough to prebake said meal before it is expelled from said holes.

"2. In a machine for extruding and puffing cereal meal: a housing having a bore therein, a rotatable member in said bore having a helical ridge on the periphery thereof, an extrusion die plate mounted on said housing across said bore and having a plurality of extrusion holes extending through the plate and communicating directly with the area in said bore occupied by the ridged periphery of said member, each of said holes having an inlet portion tapering inwardly and a cylindrical portion connected to said tapered portion and extending through the plate to the ouside surface thereof, the total cross sectional area of said cylindrical portions being sufficiently less than the cross sectional area of said bore occupied by said helical ridge and the length of said cylindrical portions being sufficiently great to create sufficient friction and pressure to raise the temperature of the meal being fed therethrough to prebake said meal before it is expelled from said holes, an annular flange on the periphery of said plate having a plurality of spaced holes therein, and means extending through said last mentioned holes for securing said plate to said housing.

"3. In a machine for extruding and puffing cereal meal: a housing having a bore therein, a rotatable member in said bore having a helical ridge on the periphery thereof, an extrusion die plate mounted on said housing across said bore and having a plurality of extrusion holes extending through the plate, and communicating directly with the area in said bore occupied by the ridged periphery of said member, each of said holes having an inlet portion tapering inwardly and a cylindrical

portion connected to said tapered portion and extending through the plate to the outside surface thereof, the total cross sectional area of said cylindrical portions being sufficiently less than the cross sectional area of said bore occupied by said helical ridge and the length of said cylindrical portions being sufficiently great to create sufficient friction and pressure to raise the temperature of the meal being fed therethrough to prebake said meal before it is expelled from said holes, and a means for engaging the marginal edge of said plate for removably securing said plate to said housing.

"4. In a machine for extruding and puffing cereal meal: a housing having a bore therein a rotatable member in said bore having a helical ridge on the periphery thereof, an extrusion die plate mounted on said housing across said bore and having a plurality of extrusion holes extending through the plate and communicating directly with the area in said bore occupied by the ridged periphery of said member, each of said holes having an inlet portion tapering inwardly and a cylindrical portion connected to said tapered portion and extending through the plate to the outside surface thereof, the total cross sectional area of said cylindrical portions being sufficiently less than the cross sectional area of said bore occupied by said helical ridge and the length of said cylindrical portions being sufficiently great to create sufficient friction and pressure to raise the temperature of the meal being fed therethrough to prebake said meal before it is expelled from said holes, an annular flange on the periphery of said plate having a plurality of spaced holes therein, means extending through said last mentioned holes for securing said plate to said housing, and a knife means intermittently passing the outlet ends of said extrusion holes for cutting the extruded material into sections.

"5. In a machine for extruding and puffing cereal meal: a housing having a bore therein, a rotatable member in said bore having a helical ridge on the periphery thereof, an extrusion die plate mounted on said housing across said bore and having a plurality of extrusion holes extending through the plate and communicating directly with the area in said bore occupied by the ridged periphery of said member, each of said holes having an inlet portion tapering inwardly and an elongated portion connected to said tapered portion and extending through the plate to

tiff's machine were embodied in prior patented food processing machines with the exception of the single stage, single head plate.

The accused device is essentially a copy of the patent in suit with only slight expected variations. The District Court held that the accused device infringed all five claims—infringement of Claims 1 through 4 by equivalency and infringement of Claim 5 directly.

■ Since we conclude invalidity of the patent in suit, there can be no infringement. Caldwell v. Kirk Mfg. Co., 269 F.2d 506, 507 (8th Cir. 1959), cert. denied, 361 U.S. 915, 80 S.Ct. 260, 4 L. Ed.2d 185 (1959); Johnson Fare Box Co. v. National Rejectors, Inc., 269 F.2d 348, 353 (8th Cir. 1959).

### Invalidity of the Patent in Suit

With the death of his brother and Rosebrook, plaintiff admittedly anticipated a charge of infringement which he sought to avoid by altering the G & R patent. Plaintiff's only material change was the substitution of a single extrusion head plate for two such plates. Plaintiff candidly admitted that the product produced by the G & R machine was identical in quality and appearance to that produced by his machine. The shape and configuration of the holes, the screw, the feed hopper, the sleeve and other structures were the same.

■ Plaintiff's motivation to avoid infringement has no bearing on the validity or lack thereof in his machine. What is important is that plaintiff's machine explicitly follows the prior art found in the G & R patent with the sole exception of utilization of a single extrusion head plate. Important also is that the prior art is replete with examples of extrusion machines using a single head plate. So many examples exist in the prior art

that only a representative few were inserted in the record evidence. Examples are Tanzi Patent No. 1,228,495 (1922), machine for making macaroni; Sizer Patent No. 1,402,672 (1922), machine for making food cubes from meal for animals; Sizer Patent No. 1,773,552 (1930), machine for making pellets for poultry food; Schreiber Patent No. 2,583,600 (1952), machine for making food from combinations containing as much as 50% molasses and 50% dry ingredients.

The synthesis of the patent in suit is, therefore, an amalgam of known elements. Plaintiff's "union" of these old elements produced nothing new, surprising, or novel, perform no new function and add nothing to useful knowledge found or taught in the prior art. In Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950), the Supreme Court quoted with approval from its earlier opinion in Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S. Ct. 662, 82 L.Ed. 1008 (1938):

"The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention." 340 U.S. at 151, 71 S.Ct. at 130.

The Court, citing Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334 (1939) and Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58 (1941), continued: "The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable." 340 U.S. at 152, 71 S.Ct. at 130. See also Selmix Dispensers,

---

the outside surface thereof, the total cross sectional area of said elongated portions being sufficiently less than the cross sectional area of said bore occupied by said helical ridge and the length of said elongated portions being sufficiently great to create sufficient friction and pressure

to raise the temperature of the meal being fed therethrough to prebake said meal before it is expelled from said holes, and a knife means intermittently passing the outlet ends of said extrusion holes for cutting the extruded material into sections."

Inc. v. Multiplex Faucet Co., 277 F.2d 884 (8th Cir. 1960); Caldwell v. Kirk Mfg. Co., supra; Briggs & Stratton Corp. v. Clinton Machine Co., 247 F.2d 397 (8th Cir. 1957), cert. denied, 355 U.S. 914, 78 S.Ct. 344, 2 L.Ed.2d 274 (1958).

Plaintiff originally supported his application with eighteen claims. Upon rejection by the patent office, he attempted amendment of some but finally cancelled all of them and submitted, at the suggestion of the examiner, the claims heretofore set out in the margin which are the basis of the examiner's approval and which measure the grant of patent. A number of the rejected claims refer directly to utilization of single head plates but the five constituting the basis of plaintiff's patent do not.[3]

Nonetheless, plaintiff's patent must be sustained if at all upon the employment of the single head plate. We assume that stripped of its patentise language, the five claims primarily focus attention to the single head plate and do not understand the patent examiner's rejection of more specific claims for this element and final acquiescence when more obscure language was employed. The examiner must have been persuaded by the configuration of the single head plate, but it is admitted that the older machines prebaked the material and there is no novelty in the shape or configuration of the element. Plaintiff admitted that the holes in the head plate were used in 1952 and that the G & R machine prebaked the material before expulsion.

Plaintiff undertakes to bolster his position by extravagant claims of commercial success, improvement eliminating employment of skilled personnel and greater production speed. Indeed, some commercial success was enjoyed, but there is no evidence that it eliminated or impeded any competition. It may be slightly more economical because one head plate is less expensive than two, but it does not eliminate skilled employees. For example, an employee must clean the head plate holes to remove the adhesion of collected material. Cleaning is performed by simply punching the holes with a sharp pointed instrument such as a screw driver or ice pick. And, there is no evidence that the operation of any machines based on an old patent required additional skill in any phase of operation. Such argument, based as it is on plaintiff's testimony, loses persuasiveness in light of the testimony of Mr. Guy Caldwell, who for years has manufactured a cheese stick product at locations in three states under the trade name of "Guy's Cheese Stix." Mr. Caldwell has used not only plaintiff's machine, but also one by the alleged infringers, and discarded the patent in suit five years before trial, replacing it with the G & R machine which made higher quality products faster.

---

3. The following are excerpts from three of plaintiff's eighteen amended claims which were withdrawn by him:

"2. A machine for producing collets from cereal, comprising a hopper for cereal, a chamber adapted to receive said cereal from said hopper, a source of water for said chamber, a means in said chamber for mixing said cereal and said water, a housing having a bore therein, a *one-piece*, one-stage plate secured to said housing across said bore and having a plurality of holes therethrough communicating with said bore and disposed in a circle in said plate adjacent the side wall of said bore * * *

"3. A machine for producing collets from cereal, comprising a hopper for cereal, a chamber adapted to receive said cereal from said hopper, a source of water for said chamber, a means in said chamber for mixing said cereal and said water, a housing having a bore therein adapted to receive the cereal from said chamber, a *one-piece*, one-stage plate secured to said housing across said bore and having a plurality of holes therethrough communicating with said bore and disposed in a circle in said plate adjacent the side wall of said bore * * *

"4. A machine for producing collets from cereal mixture, comprising a hopper for cereal, a housing having a bore therein adapted to receive cereal from said hopper, a *one-piece*, one-stage plate secured to said housing across said bore and having a plurality of *extrusion* holes therethrough and communicating with said bore and disposed in a circle in said plate adjacent the side wall of said bore * * *"

(Amendments in emphasis.)

Plaintiff also asserts that the substance of the question here is one of fact and that Fed.R.Civ.P. 52(a) requires our affirmance unless the findings are clearly erroneous. This same argument was made in Great Atlantic & Pacific Tea Co., supra, and the Supreme Court there rationalized that it was not settting aside a finding of fact as to invention, but merely correcting a defect in judgment as to the standard of invention as required by the statute, 35 U.S.C.A. § 103, where a combination is made up entirely of old components. Mr. Justice Douglas in his concurring opinion stated, "The standard of patentability is a constitutional standard; and the question of validity of a patent is a question of law." 340 U.S. 147, 155, 71 S.Ct. 127, at 132. See also Steffan v. Weber Heating & Sheet Metal Co., 237 F.2d 601, 602 (8th Cir. 1956).

We are not troubled by this issue because obviousness is apparent from plaintiff's own admissions coupled with the undisputed evidence of utilization of single head plates in many and varied extrusion machines found in the prior art.

*Recent Teachings of the Supreme Court*

On February 21, 1966, the Supreme Court expressed itself for the first time in fifteen years on patent validity in Graham v. John Deere Co., supra. Actually, two cases were involved and decided on the issue of statutory obviousness. In the companion case, Calmar, Inc. v. Cook Chemical Co., the Supreme Court reversed a holding of patent validity because it did not meet the statutory test, and found that the differences in the patent claims and the pertinent parts would have been obvious to a person reasonably skilled in that art. *Calmar* is strikingly similar to the case here.

The District Court opinion in this case was written prior to the Supreme Court's recent decisions and the writer of this opinion authored *Calmar* which was reversed.

In *Calmar*, it was admitted that the invention was a combination of old elements and here it cannot be questioned that all elements of the patent in suit are contained in the prior art. In *Calmar*, the industry faced extinction unless an integrated closure pump could be devised that could withstand shipping without leakage or breakage. In the instant case, there was no problem to be solved. In *Calmar*, there was a long-felt need for such a device, not only in the insecticide industry but also by manufacturers of other low viscous liquids. Many skilled people worked unsuccessfully for years to solve the Calmar problem, but in the instant case, so far as shown by this record, no one except plaintiff, motivated by his desire to avoid infringement, was even working on any change in the existing extrusion machines. There was nothing in the prior art in *Calmar* suggesting the combination of the old features, but in the instant case there are a number of extrusion machines utilizing the single, one stage head plate. Additionally, the patent in *Calmar* was a tremendous commercial success resulting in prompt sale of some fifteen million sprayers. The patent in *Calmar* was also adaptable to assembly line production and eliminated costly and time consuming production steps. Such results are not found in the patent in suit. More important probably is that the device in *Calmar* produced a useful result new to the industry, whereas the patent in suit does not. It is quite obvious that a much stronger case was made for patent validity than in the instant case. Nonetheless, the Supreme Court was convinced that the patent in *Calmar* must fall when the proper interpretation is made of § 103, since the differences in the claims of the Calmar patent and the pertinent prior art would have been obvious to a person reasonably skilled in that art.

We are convinced here that anyone skilled in the art with patent office references before him could have, without the exercise of any inventive faculty, combined old elements known to the art and made plaintiff's machine. Assuming that the patent in suit was an improvement over the prior art, it still does not rise to the level of patentability.

Mr. Justice Clark, in the preface of his opinion in *Graham,* supra, called attention to the origin and history of the patent law and pointed out that, from its very inception, the granting of patents for small details or obvious improvements has been abhorred. We could not follow the guidance of the Supreme Court without ruling the invalidity of the patent in suit and would be compelled to do so anyway under the previous rulings of the Supreme Court as well as the decisions of this circuit.

The judgment of the District Court is reversed and it is ordered that the same be set aside in its entirety.