51 CCPA
**Application of Kemper M. HAMMELL.**
**Patent Appeal No. 7201.**

United States Court of Customs
and Patent Appeals.
June 11, 1964.

William Hintze, Harrisburg, Pa. (Truman S. Safford, Curtis, Morris & Safford, New York City, Marshall M. Holcombe, Harrisburg, Pa., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (George C. Roeming, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

ALMOND, Judge.

This appeal is from the decision of the Board of Appeals holding the claims of application Serial No. 687,217 [1] unpatentable.

The invention relates to self-locking electrical terminals for connecting the ends of a pair of wires, and particularly to tapered tabs of small size made from sheet metal. The flat tabs are tapered at an angle of about 3 to 4 degrees between the sides of the tab in order that the receptacle-entering end of the tab is narrower than the wire-connected end. The receptacle, connected through a ferrule to the bared end of an insulated conductor, is adapted to be forced on the tab to bring the angled sides into a force-fit frictional connection. In addition, a pair of flanges on the receptacle provides spring elements serving to confine the tab on insertion and to press it into contact with the bottom portion of the receptacle engaging the underside of the tab.

Claim 3 is illustrative of the invention claimed and reads as follows:

"A receptacle for electrical connection with a substantially flat contact blade having converging sides comprising a web having a contact surface thereon, overhanging spring members extending from opposed sides of said web, the ends of said members overlying said web to engage the blade yieldingly with said contact surface, the longitudinal side portions of said web being bowed to extend from the portion of said web

1. Filed September 30, 1957, for "Electrical Connector."

including said contact surface, first downwardly and outwardly and then into integral continuity with the respective spring members, said receptacle converging away from the mouth thereof so that the receptacle side walls converge to receive there between the blade sides in a tight fit."

The five claims have been considered below and in the briefs on appeal as falling into two separate groups.

Appellant's brief summarizes the rejections as follows:

"In the posture the case now assumes claims 1 and 2 stand rejected as being cross-readable with claims of a later filed commonly owned application of one Carlson, Serial No. 475,733, the Carlson claims being counts of an Interference No. 88,609 with a third party interferant; and claims 3, 4 and 5 as being unpatentable over the same Carlson claims in view of secondary reference patents to Stiles—735,839; Hayes—2,579,-739 or Batcheller—2,820,212. During the motion period of interference 88,609, appellant and the common owner brought claims 1 and 2 forward in the interference while requesting interference to be declared with the third party interferant."

A preliminary question presented is whether claims may properly be rejected for lacking patentable distinction over claims of a copending application. In other words, can there be "double patenting" without a patent? Appellant states it this way:

"It thus becomes clear that *no patent has yet been issued on the subject matter of appealed claims 1 and 2*. The Carlson claims (and the adverse interferant's claims) in interference are still in application form and the interference has not yet been terminated. Obviously, as no

monopoly has as yet been granted, there can be no extension of it; nor has any inventor been issued the first patent on the subject matter." (Emphasis present.)

The examiner cited sections 305, 305.-02(a), and 822.01 of the Manual of Patent Examining Procedure as authority for the rejections based on the claims of the Carlson application. The solicitor points out that in the case of In re Stanley, 214 F.2d 151, 41 CCPA 956.

" * * * this Court expressly approved the Patent Office practice (as authorized by the manual) of rejecting claims for lack of patentable distinction over claims of the common assignee's earlier filed application. Moreover, this Court indicated that the Examiner has a duty to follow that practice in an appropriate case."

█ It is a well established practice to reject claims in an application related to another application in interference over the counts of the interference, and to suspend action pending the award of priority.[2] The reason for it is to provide a service to the applicant so that he may take corrective action by putting all of the conflicting claims in one application before a patent issues containing only part of them. If the applicant does not want the service, he may press for a decision in any of his pending applications. The facts presented in Ex parte Bullier, 1899 C.D. 155, 88 O.G. 1161, are similar to those here present. There the claims were rejected in view of similarity to counts in an interference and action was suspended on the ex parte application pending the outcome of the interference. The Assistant Commissioner said:

"The possibility, however, that the Examiner may be mistaken in holding that the claims in this case are not patentable over the invention

2. See Glascock and Stringham, Patent Soliciting and Examining (Pacot, 1934) § 139, and cases there cited. See also Stringham, Double Patenting (Pacot, 1933) § 2858.

shown by the other party to the interference must be contemplated just as the rules providing for appeals contemplate the possibility of mistake in rejecting claims on references. The applicant should be allowed to contest that question at the present time instead of being compelled to wait until the interference is decided. The question to be determined is of the same kind as if a decision had been rendered against this applicant in that interference, and it would be unjust to him to cause him the delay when the matter can be settled at the present time."

It appears that appellant here seeks to test the correctness of the "double patenting" rejection over the claims of the commonly assigned Carlson application in interference. We agree with appellant that no issue of estoppel or election of one application at the expense of another is here presented. It seems clear that appellant has the right to appeal the "double patenting" rejection without foregoing the Carlson application.

The issue here presented, therefore, is whether a patentable distinction exists between th claims on appeal and those in Carlson. In re Zickendraht, 319 F.2d 225, 50 CCPA 1529; In re Simmons, 312 F.2d 821, 50 CCPA 990.

An understanding of the differences between the claims on appeal and those in Carlson is aided by reference to the drawings.

Appellant points out that claim 1 on appeal calls for spring members which extend "downwardly at their ends toward said web to terminate in free end edges overlying said web." On the other hand, appellant states that "Carlson's side walls are circular and terminate in end portions which extend horizontally at their ends towards one another for a considerable length, almost to meet."

As to claim 2, appellant notes that "planar side wall portions" are required.

The board said, with respect to claim 1:

"We consider the term "at their ends" not to be restricted to those parts of said spring members located at the very tip ends thereof, but to be broad enough to encompass considerable extents of said members inwardly of said tip ends, which in Carlson may be taken as the flat portions 15 together with the upwardly directed parts inwardly thereof extending to the highest level of the clip entity depicted in Figure 3. In this sense, the end portions of the spring members so taken clearly extend downwardly toward the web and terminate in free end edges that overlie the latter. * * * the engagement with the blade called for in claim 1 is recited in terms broad enough to pertain to the spring members considered as a whole, and this is the case in Carlson."

■■ While the board's statement points out similarity of *disclosure*, it is the *claims* of Carlson which must be considered. In re Greenlee, 222 F.2d 739, 42 CCPA 926. Claim 8 of the Carlson application includes "opposed side wall portions" connected by an integral web, with "inwardly directed flanges extending from said side wall portions and overhanging said web." We agree with the board that the spring members of appellant's device as claimed are patentably indistinct from those claimed in Carlson. The spring members grasp the tab and clamp it between the base web and the ends of the spring members in each case.

In order to clamp the tab, the spring members obviously "extend downwardly" to some extent.

■■ As noted by the solicitor, appellant discloses *planar* side walls *converging* within a specific angular range in both the clip and tab to achieve a force fit with minimum effort, and that "Appellant's claim 1 sets forth neither the planar side walls nor the convergence of the walls." Claim 2, which calls for "substantially planar" side walls, does not set forth the convergence of the walls. Therefore, as the solicitor states, "whether the side wall is planar or curved is merely a matter of choice between structures obvious to one skilled in the art * * *." We find nothing unobvious in making side walls "substantially planar." Therefore, we will sustain the rejection of claims 1 and 2 over the claims of the Carlson application.

Claims 3, 4 and 5 are rejected as unpatentable over the allowed claims of Carlson in view of any one of the following patents:

| Stiles | 735,839 | Aug. 11, 1903 |
| Hayes | 2,579,739 | Dec. 25, 1951 |
| Batcheller | 2,820,212 | Jan. 14, 1958 |

The Stiles patent discloses a tapered element clamped in a correspondingly tapered receptacle to provide a wedge-fit mechanical and electrical contact.

The Hayes patent discloses a "tapered notch" which cooperates with downwardly extending tips of the receptacle to perform a clamping function.

The Batcheller patent discloses an electrical connector having converging walls for receiving and clamping tapered elements.

Claims 3, 4 and 5 define the spring members only as overhanging, but differ from claims 1 and 2 in reciting the tapered configuration of the receptacle. The board did not find the converging taper patentably significant in view of the secondary references, each of which shows tapered elements clamped by converging walls. The board said:

"Taking Stiles as exemplary of the subsidiary references, this patent

**800**

clearly discloses that connectors having tapered receptacles and correspondingly tapered pins for cooperation with said receptacles are an old and known expedient in the art."

Appellant argues that the tapered connector of claims 3, 4 and 5 is "of a class and nature completely different from that disclosed by Carlson." Again, it is important to note that only the *claims* of Carlson may be relied on here, in spite of appellant's consideration of the "teachings" of the entire disclosure.

It is true that the Carlson claims are not limited to tapered connectors, but in view of the presence of the wedge-fit taper concept in the secondary references, we are not satisfied that such a limitation defines an unobvious variation over the connector claimed in Carlson.

Accordingly, the decision of the Board of Appeals is affirmed.

Affirmed.