**NATIONAL CONNECTOR CORPORATION, Appellant,**

v.

**MALCO MANUFACTURING COMPANY, a Partnership, Amphenol Corporation, and Malco Manufacturing Company, Inc., Appellees.**

**MALCO MANUFACTURING COMPANY, a Partnership, Amphenol Corporation, and Malco Manufacturing Company, Inc., Appellants,**

v.

**NATIONAL CONNECTOR CORPORATION, Appellee.**

**Nos. 18705, 18706.**

United States Court of Appeals
Eighth Circuit.

April 11, 1968.

John D. Gould, of Merchant & Gould, Minneapolis, Minn., for National Connector Corp.; Robert T. Edell, Minneapolis, Minn., was on the brief with John D. Gould, Minneapolis, Minn.

Wm. Marshall Lee, Hume, Clement, Hume & Lee, Chicago, Ill., for Malco Mfg. Co., etc.; Roy E. Hofer, Chicago, Ill., was on the brief with Mr. Wm. Marshall Lee. Also on the brief with Wm. Marshall Lee, Chicago, Ill., were Erwin C. Heininger and Robert L. Stern, of Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., for Amphenol Corp.

Before VOGEL, Senior Circuit Judge, and BLACKMUN and LAY, Circuit Judges.

LAY, Circuit Judge.

The defendant National Connector Corporation (hereinafter called National) is charged by the plaintiffs (although more than one, hereinafter called Malco) with infringement of two United States Letters Patent Nos. 2,995,617 and 3,086,074, relating to electrical connectors.[1] The district court held patent '617 valid as to certain claims and found that National had infringed this patent in its types A and B series connectors, but not with its type C connector. In No. 18,705, National appeals the judgment of validity of patent '617, as well as the finding of infringement. In No. 18,706, Malco has cross-appealed the rejection of its claim of infringement by National's type C and likewise complains of the court's finding that patent '074 was invalid and additionally, of the finding that it was not infringed by National. In the judgment below Malco was awarded an accounting to ascertain damages. This action was stayed pending this appeal.

---

1. Malco also charged infringement of its Letter Patent No. 3,136,591. The court denied validity. This finding is not appealed.

We find it unnecessary to discuss the claim of patent misuse and the various claims of infringement. We affirm the trial court's finding of invalidity on the '074 patent, and reverse as to the '617 patent, finding as a matter of law both patents obvious under 35 U.S.C. § 103.

*MAXIMOFF '617 PATENT.*

This patent is basically described by its title as a "Self-Locking Terminal." It consists of a metal contact or pin, inserted in a base plate (metallic) through a hole, held by a sleeve, sometimes called a bushing. It is described as a "feed through" terminal, which allows the flow of electrical impulses into multiple connections. The function of a very simple terminal connector may be visualized with the ordinary light plug. The utility of multi-contact terminal connectors becomes readily apparent in the twentieth century world of electronics. A means is thus provided for thousands of individual electrical connections through the use of a unitary terminal. As plaintiffs urge, the multi-contact terminal connector is the "heart" of the modern day computer, telecommunications systems and similar advanced electronic technology. For illustration, plaintiffs' plate-type connectors have been adopted by the United States Navy for the Polaris Missile program.

Malco first developed its "self-locking terminal" in 1957. It urges that it made possible the later development of its large "plate-type" terminal connectors, now used in the Polaris program. Contemporaneously, in 1960, Gardner-Denver Company developed a machine for automatically wiring a large, plate-type panel of terminal connectors. Thereafter, commercial success and utility were found for the plate-type connectors. The fabrication of these plates is considered by Malco to be a "trade secret."

Prior to the development of Malco's plate, molded block terminal connectors enjoyed exclusive commercial utility by computer manufacturers. It is pointed out that these blocks present many deficiencies which make them inferior to Malco's plate-type connectors. Efficiency, utility, flexibility and economy summarize the detailed arguments of improvement. Malco contends the rapid commercial acceptance of the plate-type connector demonstrates the obvious superiority between the two. These facts are deemed relevant by Malco since they argue that the plate-type connectors were made possible by development of the '617 self-locking terminals. Malco's evidence relates that the specific advantages of the "self-locking" terminal are rigidity of retention, low insertion forces, inherent straightening, elimination of manufacturing tolerances upon final assembly, inherent axial resiliency, capacity for extreme density of terminal contact pattern, flexibility for circuitry changes and versatility for prototype design of complex electronic systems.

It is urged that the novelty of the '617 terminal is in the "self-locking" concept. Malco claims that prior art employed locking barbs or other locking means of the contact pin within the plate. Malco urges that the "uniqueness" of the '617 patent is that it incorporates a flat or rectangular pin larger than the "aperture of the sleeve." When the pin is driven into the sleeve a "laterally opposed pressure locking force is imparted at laterally opposed positions." Thus the sleeve grips the two opposite sides of the plate aperture which rigidly holds the contact pin. This is referred to as an "opposed pressure interference fit."

In simplification, we quote from Malco's opening statement to the trial court, " * * * so what we are talking about here is driving a square peg in a round hole. * * * " And as counsel added, the essential difference is that the prior art " * * * shows round terminals in round sleeves in round holes."

The trial court found the '617 patent not anticipated by the prior art, and held the patent valid under § 103 relying upon (1) the immediate "phenomenal" commercial acceptance with the country, (2) the long-felt need and (3) the unexpected advantages and results flowing from its development. Cf. United States

v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

■■ The basic issue, assuming novelty and utility established, concerns "obviousness" under § 103. This necessitates inquiry into (1) the determination of the scope and content of the prior art, (2) the ascertainment of the difference between the prior art and the claims under '617, (3) "the background skill of the calling," and (4) the existence of so-called "subtests" or collateral indicia of "nonobviousness." Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). However, "subtests" cannot become persuasive if prior art anticipates or otherwise makes obvious the attributes of the improvement involved.

Thus, in Calmar, Inc. v. Cook Chemical Co., decided together with *Graham*, supra at 26, 86 S.Ct. 684, 15 L.Ed.2d 545, although the patented device fulfilled a long-felt need and found great commercial success, nevertheless, these factors did not tip the scales of patentability where the improved art was found to be a "nontechnical" difference. See also Kell-Dot Industries, Inc. v. Graves, 361 F.2d 25 (8 Cir. 1966).

The prior art in the present case included electrical connectors described as the British, No. 641,917, Carlson, No. 2,919,300 and Clark, No. 2,744,812 patents. All of these utilized round pins in round sleeves, providing hermetic seals. Malco distinguishes the British patent as having a "conventional circumferential press-fit." In the Clark and Carlson patents there is no gripping effect involved, since the pin is the same size as the aperture. It is further argued that none of these patents features the non-round pin of the '617 patent.

And, Malco urges that '617 involves a different technique. The claim is made that all of the many advantages of the self-locking terminal flow from the new concept of *"opposed pressure* interference fit." Malco contends this is necessarily distinguishable from the prior art and any of its obvious potentialities. It

is contended that this is made possible by the novel use of a flat terminal pin, called a "non-round gripping shank" in a sleeve and aperture of smaller dimension. As Malco urges, this is the *"vital* additional element."

It is stated that although the prior art, to-wit, Oxley, No. 2,911,460, anticipates the flat terminal pin, it is easily distinguishable since Oxley locks by barbs and does not rely upon any kind of press-fit. Oxley also alternatively employs a round pin. National attempts to demonstrate by the Oxley flat pin in combination with the British patent that the '617 invention is anticipated. Malco replies that this is "hindsight" application, that the advantages of the combination were unobvious, and in the words of their expert, "no one knew that it would work."

One of the difficulties in evaluating the '617 patent is that throughout the testimony there appear many claimed attributes of the self-locking terminal, which necessarily go beyond the basic patent involved. The facility of insertion force, torque resistance, straightening, rigidity retention, density, et al., relate as much to other *vital* factors outside of the specific claims of '617 itself. It is evident that the material within the plate and sleeves, the fabrication of them, the punching of the holes in the plate, the dimensions of the pin, the bushings and aperture involved are all significant and related to the claimed attributes. Malco's early claims demonstrate that the use of locking notches now excluded from the patent itself exaggerates many of these claimed advantages. The examiner excluded the locked notches from the original filings as being directly anticipated by the prior art. This was originally related by Malco to be an "important feature" of the patent.

■ Mr. Kukla, the former head of the Research and Development Department of Malco, testified: " * * * in the beginning of the program * * * the plastics [used] were just too soft * * * " to give stability to the pin. And he adds " * * * the amount of

reduction of the nylon \* \* \*" determines to a great extent the stability of the pin in the final assembly. The substitution of material is not patentable. See Insulite Co. v. Reserve Supply Co., 60 F.2d 433, 437 (8 Cir. 1932). Mr. Kukla adds that the kind of material, the thickness of the plate (affects torque), the punching with a precise pattern (tolerance and density) and the preferred moisture content in the fabrication of the plates are all critical and yet not disclosed within the '617 patent. Malco admits the development of the Gardner-Denver automatic wire wrap machine substantially facilitated mass production of its plate-type connectors. All of the above factors leading to commercial success render this subtest less significant in measuring nonobviousness of the patent involved. See American Infra-Red Radiant Co. v. Lambert Industries, Inc., 360 F.2d 977, 989–990 (8 Cir. 1966).

Rectangular terminals are not novel in the electronic field. The evidence is undisputed that the primary reasons Malco tried the rectangular pin was directly related to the Gardner-Denver Company requirement for their earlier hand wire wrap equipment. As early as 1951 Gardner-Denver recommended terminals have at least two sharp corners. The Gardner-Denver automatic wire wrap machine was not developed until the fall of 1960, and its recommendations for flat terminals still persisted.

In essence, Malco's claim must rest upon the asserted claim of a combination of old elements, in a new way which produced multi-contact terminals in a more efficient and cheaper way. This was the standard for patentability upheld by the Fifth Circuit involving the Graham patent. Jeoffroy Mfg., Inc. v. Graham, 219 F.2d 511 (5 Cir. 1955), cert. den. 350 U.S. 826, 76 S.Ct. 55, 100 L.Ed. 738. This standard was later rejected in the *Graham* Supreme Court decision, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545. Likewise rejected was this Circuit's view that such a combination must produce a new result. See 383 U.S. at 4, 86 S.Ct. 684, affirming on other grounds 333 F.2d 529. The problem is that such an argument likewise overlooks that obvious attributes of the prior art necessitate exploration as well as the prior art itself. Graham v. John Deere Co., supra; Calmar, Inc. v. Cook Chemical Co., supra.

■ We can see nothing novel or unique in changing a round pin to a flat one. Nor do we see nonobvious attributes to the insertion of a rectangular pin and sleeve into a smaller aperture within the plate itself. Nor are we impressed with the nuance urged that pressure interference fit takes place within the board rather than without. Differences in configuration only are not patentable. Gerner v. Moog Industries, Inc., 383 F.2d 56 (8 Cir. 1967).[2] As has been stated many times, changes of mere form, proportions or size will not sustain patentability. Malco's own witness stated that with the need to make a pin suitable for the wire wrap machine that it was "logical to go to square or rectangular shank." Cf. Greening Nursery Co. v. J & R Tool & Mfg. Co., 376 F.2d 738 (8 Cir. 1967) [obvious: changing square plate to round one with more efficient results]; Superior Concrete Accessories, Inc. v. Richmond Screw Anchor Co., Inc., 369 F.2d 353 (8 Cir. 1966) [obvious: changing angle of bolt from 90° to 45° "in order to hold a form for a skirt or addition to the outer edge of the structure."] Malco fails to point out any prior difficulties or deterrents known with electrical connectors involving the combination of the "square peg in a round hole." Cf. United States v. Adams, supra.

Nor can we be impressed that the "opposed pressure" fit is so unique or non-

---

2. Apropos is Thomas Jefferson's comment cited by Mr. Justice Clark: "[A] mere change of form should give no right to a patent, as a high-quartered shoe instead of a low one; a round hat instead of a three-square; or a square bucket instead of a round one." Graham v. John Deere Co., 383 U.S. 1, 10 n. 3, 86 S.Ct. 684, 690, 15 L.Ed.2d 545.

obvious. Of course, different frictional pressures will react depending upon the configuration of the objects used. The concept of interference fitting belongs in the public domain.[3] It belongs to ordinary people with ordinary minds. The fact that it is accomplished with different shaped objects in multi-shaped receptacles can make little difference. See Application of Chupa, 359 F.2d 908 (U.S. Ct.Customs & Pat.App.1966) [obvious: axial and radial compression inherent in the change of a configuration]; Application of Hammell, 332 F.2d 796 (U.S.Ct. of Customs & Pat.App.1964) [obvious: "force-fit" frictional electrical connections.] Although it might be accomplished in different, ways, the principle itself can be said to be older than the cork and the bottle.

 The change in the form of any element of a prior patent must result in more than a useful natural phenomenon which man has accumulated through common knowledge. Thus, even though the use of a new device greatly improves the field and provides great utility, and commercial success is enjoyed because of the long-felt need, these features cannot sustain patentability where involved is only an extended application of obvious attributes from the prior art. Cf. Frederick Stearns & Co. v. Grove's Laboratories, Inc., 87 F.2d 822, 824 (8 Cir. 1937).

 In summary, it should be stated that nonpatentability does not turn upon the new device utilizing isolated elements of prior art and combining them. When the resulting new combination produces a totally new functional aspect, to deny patentability in every case would be to sanction the use of "hindsight" in light of the claimed patent. However, at the same time, to deny patentability where the combination of elements is an obvious step, where no inherent difficulties or deterrents are involved in making the step, where the new combination results in a natural phenomenon, even though all of the advantages were not foreseen, should not bring into play the introspective condemnation of using "hindsight." The test of obviousness, again, must turn upon a case by case analysis. See L & A Products, Inc. v. Britt Tech Corp., 365 F.2d 83, 86 (8 Cir. 1966). This reduces Malco's claim to simply being first with a good idea. Of course, this alone is not a basis for patentability. Id. at 87.

This brings us to the second patent, No. 3,086,074. The trial court denied the validity of this patent in view of the prior art on the grounds of obviousness and lack of novelty. This patent involves "self-orientating terminal connectors." It relates to the proper alignment of the electrical terminal by using square or polygonal heads on the insulating sleeves. The desired goal is proper mating between a male and female connector. They plug together and allow little or no "angular misorientation" between perpendicularity of the male blade to the plane of the female connector.

The trial court found:

"Although this prior art discloses polygonal heads which touch each other, it would be quite obvious to anyone with ordinary skill in the art, that in terminal boards utilizing hundreds and even thousands of connector sleeves, and in view of tolerance variations, a small space therefore between the polygonal heads would be advisable. * * *

"The Court finds, therefore, as to the second patent that it discloses no novelty over the prior art other than the utilization of mechanical skill in the spacing of a multitude of apertures in a terminal board requiring a compactness of bushings and terminal pins in a small area and the recognition of the necessity of some spacing

---

3. In describing this Malco's Mr. Kukla stated: "I believe a substantial interference fit is when an object is placed into a hole in a plastic sleeve and subsequently when the outside of the sleeve yields or expands, you have established a substantial fit."

between the polygonal bushings in view of the necessity of replacing damaged bushings. * * *"

Again, the form of the insulating sleeve is changed from a round one to a square or polygonal shaped head. Our discussion under the '617 patent is applicable here. Likewise, the concept of the spacing or clearance between the bushings cannot be accepted as novel or unobvious.[4]

We agree with the trial court that the improvement upon the prior art, the Netherlands, patent No. 64,131 and Powell, patent No. 2,930,020, involved only the mechanical skill of the art involved.

The judgment is reversed in No. 18,705 as to the '617 patent and it is remanded with directions to dismiss. Judgment is affirmed in No. 18,706 as to the '074 patent.

---

4. Cf. Skee-Trainer, Inc. v. Garelick Mfg. Co., 361 F.2d 895, 899 (8 Cir. 1966). Simplicity is not the same as obviousness. However, where there is only a "mechanical" advance it must be held to be obvious to one with ordinary skill and knowledge of prior art in this field.